IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| OREGON NATURAL RESOURCES COUNCIL FUND, et al., | ) ) ) | Civil No. 05-3004-PA (lead case) |
| Plaintiffs, | ) ) | CONSOLIDATED CASES |
| v. | ) ) | |
| LINDA GOODMAN, et al., | ) ) | **OPINION AND ORDER** |
| Defendants, | ) ) ) | |
| and | ) ) | |
| MT. ASHLAND ASSOCIATION, dba SKI ASHLAND, | ) ) ) | |
| Defendant-Intervenor. | ) | |

------------------------------)

| | | |
|---|---|---|
| ERIC NAVICKAS, | ) ) | Civil No. 04-3109-PA |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES FOREST SERVICE, | ) ) | |
| Defendant, | ) ) ) | |
| and | ) ) | |
| MT. ASHLAND ASSOCIATION, dba SKI ASHLAND, | ) ) ) | |
| Defendant-Intervenor. | ) | |

------------------------------

/ / / /

/ / / /

1 - OPINION AND ORDER

**PANNER, Judge.**

Plaintiffs Oregon Natural Resources Council Fund, Sierra Club, the National Center for Conservation Science and Policy (formerly known as Headwaters), and Eric Navickas bring these consolidated actions against the United States Forest Service and Regional Forester Linda Goodman.  Plaintiffs ask the court to vacate Defendants' decision approving expansion plans for the Mount Ashland Ski Area.  The Mt. Ashland Association ("MAA"), dba Ski Ashland, operator of the existing facility and proponent of the expansion project, was permitted to intervene as a defendant. All parties move for "summary judgment."[1]

## Background

The Mount Ashland Ski Area (the "ski area") is situated on National Forest land at the crest of the Siskiyou Mountains, just north of the California-Oregon border and about 7 air miles from the City of Ashland.  The Forest Service has issued a Special Use Permit ("SUP") authorizing operation of the ski area. Construction of the present ski area commenced in 1963, and the area opened in 1964.

During its first three decades, the ski area was operated by a succession of private, for-profit companies, for whom it proved a financial disappointment.  In 1992, the private operator decided to close the ski area.  Plans were drawn up to dismantle the chair lifts and other improvements. AR 4784-4837.  The City

---

[1] Summary judgment standards and procedures are inapposite to most cases in which agency action is reviewed under the Administrative Procedure Act.  The better practice is to utilize appellate briefing procedure (opening brief, response, and reply).  The present case was reassigned to me after briefing was nearly complete.

of Ashland then interceded, acquiring the Special Use Permit and
facilities.  AR 4921-43.  The City leased the ski area, for a
nominal sum, to Intervenor MAA, a non-profit entity established
for the purpose of operating the ski area.  AR 4862-4920.  The
lease expires in 2017, with an option to renew through 2042.  AR
4862.

The ski area currently occupies about 287 acres.  It
includes a day lodge, ski rental shop, four chairlifts, and
approximately 123 acres of ski runs.  While the parking lot has a
theoretical capacity of 550 to 600 vehicles, snow banks may
obstruct parking spaces, and drivers leave space between vehicles
to facilitate access, thereby reducing the actual capacity.  The
parking lot often is full, and overflowing onto the entrance
road, on weekends during peak ski season.

Expanding the Mt. Ashland ski area is not a new idea.
Various plans have been propounded over the past 40 years.  AR
191 (expansion proposal initiated about 1967); AR 185-242 (1972
study of expansion); AR 4410 (1984 proposal); AR 1510-1605 (1987
study).  Those plans were slow to reach fruition, partly due to
financial difficulties and changes in ownership, and in part
because of environmental concerns.

In 1991, the Forest Service approved expansion of the ski
area in concept.  Mount Ashland Ski Area Master Plan Record of
Decision ("1991 Master Plan"), AR 4404-23.  See also AR 4131-4403
(Final Environmental Impact Statement for 1991 Master Plan)
("1991 FEIS").  Additional environmental analysis was planned to
consider the details, such as the precise location of each
component and the construction design.  AR 4411.  That expansion

3 - OPINION AND ORDER

project was derailed by the private operator's financial troubles, which led to the City of Ashland acquiring the assets and SUP.

The City's lessee, MAA, submitted a new expansion proposal in 1998. A draft environmental impact statement ("EIS") was circulated in January 2000. AR 12569-13208. It generated considerable controversy, in part because the only two action alternatives evaluated were perceived as too similar. AR 19354-62, 22130-32.

A revised draft EIS was circulated in 2003. AR 22140-23222. The Final EIS was issued in August 2004. ("FEIS" or "2004 FEIS"). The Forest Service, in a decision announced in September 2004, generally endorsed the expansion proposal submitted by MAA (Alternative 2 of the 2004 FEIS), with some modifications.

This decision received mixed reviews. The federal Environmental Protection Agency ("EPA") favored Alternative 3,[2] which would confine development to a smaller footprint, away from most streams and wetlands. Some environmental groups preferred Alternative 5, which would place most improvements within the footprint of the present ski area. 28 notices of appeal were filed, AR 28574, including one by a Forest Service biologist concerned about impacts on the Pacific fisher. AR 27109. All

---

[2] Defendants' briefs repeatedly say that EPA's concerns were satisfied, and imply EPA now supports the project approved by the Forest Service. While a number of concerns mentioned in EPA's 2003 comments were resolved in the final EIS, the agency continued to support Alternative 3, and not the project selected by the Forest Service. AR 26866 (letter of Oct. 26, 2004) ("we continue to prefer Alternative 3").

administrative appeals were denied in December 2004.  The present litigation followed.

The existing ski facilities at Mt. Ashland are considered primarily suitable for advanced skiers.  78 percent of the present terrain is rated as either expert or advanced-intermediate level.  The expansion project, as approved by the Forest Service, will add 16 new ski runs.  Seven existing ski runs will be widened by removing trees and shrubs, with the intent of making those runs safer.  Many of the new ski runs and other visitor facilities are aimed at novice or intermediate level skiers.  It is hoped this will expand the user base while making the facility safer for visitors, who won't be compelled to ski on slopes exceeding their abilities.  Facilities serving non-skiers, such as tubing and indoor activities, will also be added.

Additional chairlifts will be constructed, along with two "surface lifts" intended for sightseeing by non-skiers and for transporting injured skiers.  Some existing chairlifts are presently subject to closure on windy days.  The new lifts will be better sheltered, permitting the ski area to operate during less-than-optimal weather conditions.  Several new structures will be erected, including a lodge, a restaurant and other food services, and facilities for the Ski Patrol.  Expanded parking lots will hold approximately 220 additional vehicles.  Infrastructure--such as power, water, wastewater, and night lighting--will be expanded.  A helispot will accommodate emergency helicopters.  Road construction will include 0.41 mile of new road and 0.44 mile of reconstructed road.

/ / / /

5 - OPINION AND ORDER

The total size of the proposed expansion, in acres, is not stated in the Record of Decision ("ROD") and 2004 FEIS-- or at least the court could not find that information amidst those 1,270 pages.  In preparation for the expansion, the ski area permit boundary was enlarged from the original 290 acres to approximately 960 acres.  AR 4411, 4417; 2004 FEIS I-7, n. 3. The expansion project site appears to be about 300 to 400 acres,[3] in addition to the existing 287 acre development.  Approximately 68 acres of forest will be logged.

The Mt. Ashland ski area is important to the local economy, both as an incentive to reside in the region, and because winter is otherwise the slow season in this locale.  Tourism dwindles in winter, the Oregon Shakespeare Festival goes on hiatus, and the pear harvest is done.  Proponents of the project believe expansion is essential for the ski area to remain competitive with other ski areas in the west.[4]  Opposition to the proposed expansion has focused largely on environmental concerns,

---

[3]  The special use permit area is 960 acres.  The existing facilities occupy 287 acres.  Judging by the maps in the 2004 FEIS and ROD, the expansion will extend across an area containing over half the remaining 673 acres, specifically, nearly all of the special use permit area situated northwest of the current facilities.  The ROD and FEIS (and Defendants' briefs) use the figure "71 acres," but that is the acres of new "traditional cleared runs" to be constructed, *i.e.,* land on which all trees and shrubs will be removed.  ROD-13.  Though that figure is important for estimating erosion, the overall project area--which will be fragmented by ski runs, traversed by ski lifts, and impacted by other improvements--is obviously larger than just the actual ski runs.

[4]  The economic argument, and need for a better balance of terrain, are not new issues.  Both were cited as the rationale for prior expansion proposals.  AR 186, 191-92 (1972); AR 198 (forecasting demise of ski area unless expansion approved); AR 1512, 1515 (1987 proposal).

especially protecting the City's drinking water supply and the remaining forests adjoining the Siskiyou Crest.  Some also have questioned the financial viability of the project, and whether there is enough demand to justify additional ski facilities at Mt. Ashland.

Plaintiffs contend the expansion project will increase erosion, sediment production, and pollution in the watershed where the project is situated.  A significant impairment of drinking water quality or increase in sedimentation would affect the City of Ashland, which obtains its drinking water from this watershed.

Other significant issues raised include encroachment into the McDonald Peak roadless area, protecting a unique grove of Englemann Spruce and various plants and animals in the area, and protecting an important corridor used by wildlife traveling between several mountain habitats.  The ski area and proposed expansion "lie[] within a landscape that has long been recognized as biologically diverse and central to the long-term migration and evolution of species in the northwest."  FEIS IV-114.  The expanded ski area also will be clearly visible on the face of Mt. Ashland, a regional landmark.  FEIS IV-183, IV-197.

The Forest Service concluded that the benefits expected to result from the expansion outweigh the predicted environmental impact.  The Forest Service also concluded that certain design modifications will keep adverse impacts to an acceptable level. Plaintiffs disagree.

/ / / /

/ / / /

7 - OPINION AND ORDER

## Legal Standards

This court's authority to review the actions of the Forest Service concerning the Mount Ashland expansion project derives from the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Review under the APA is deferential with respect to any factual findings or exercise of agency judgment.  The court's role is not to impose its own views regarding the merits of the project. Rather, the agency's decision must be affirmed unless arbitrary, capricious, an abuse of discretion, made without observance of required procedures, or otherwise contrary to law.  5 U.S.C. § 706(2).  The agency's decision is arbitrary and capricious if the agency fails to consider an important part of a problem, offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.  Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005) (as amended).

The governing law in this case includes the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321-4370f, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*

NEPA has two principal aims.  Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, 462 U.S. 87, 97 (1983). First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." Id. (internal quotation marks omitted).  "Second, NEPA mandates that government agencies inform the public of the

potential environmental impacts of proposed actions and explain how their decisions address those impacts." Citizens Committee to Save Our Canyons v. United States Forest Service, 297 F.3d 1012, 1021 (10th Cir. 2002).

NEPA dictates procedural safeguards rather than a certain result. Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1989); Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355-56 (9th Cir. 1994). "NEPA does not force an agency to choose the most environmentally sound alternative, but it does ensure that agency action is 'fully informed and well considered.'" Natural Resources Defense Council v. United States Forest Service, 421 F.3d 797, 811 (9th Cir. 2005), quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 558 (1979).

"Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed--rather than unwise--agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." Id. at 350.

Therefore, a reviewing court must ensure that the agency took a "hard look" at the environmental consequences of its decision, and that the law's procedural safeguards were followed. Pit River Tribe v. United States Forest Service, 469 F.3d 768, 781 (9th Cir. 2006). An EIS must "provide full and fair discussion of significant environmental impacts and shall inform

9 - OPINION AND ORDER

decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

In reviewing the adequacy of an EIS, this circuit applies a "rule of reason" standard, asking "whether an EIS contains a reasonably through discussion of the significant aspects of the probable environmental consequences." Churchill County v. Norton, 276 F.3d 1060, 1071 (9th Cir. 2001).  The court must make "a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation." Id.

NFMA requires the Forest Service to create a comprehensive Land Resources Management Plan, also known as a Forest Plan, for each national forest. Lands Council, 395 F.3d at 1033.  NFMA prohibits any site-specific activities that are inconsistent with the Forest Plan. Id.  The Forest Service may amend a Forest Plan.  The procedure to be used varies, depending on whether the amendment is "significant." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 897-900 (9th Cir. 2002); Citizens Committee to Save Our Canyons, 297 F.3d at 1032-34.

Unlike NEPA, which is purely procedural, NFMA also imposes substantive constraints on management of forest lands, such as a requirement to insure biological diversity. Native Ecosystems Council, 304 F.3d at 898.

## Discussion

### A.  Extra-Record Materials

All parties have filed extra-record declarations, and moved to strike some of the other sides' materials.  With narrow

exceptions, "judicial review of agency action is limited to review of the administrative record." Animal Defense Council v. Hodel, 840 F.2d 1432, 1436-38 (9th Cir. 1988), amended, 867 F.2d 1244 (9th Cir. 1989).

If I allow Plaintiffs and Defendants to file extra-record materials that are substantially rebuttal, each side would want further responses.  The administrative record already totals nearly 30,000 pages, in addition to the voluminous legal briefs.

I have reviewed the extra-record submissions and they are substantially rebuttal that is either in the administrative record or should have been.  Accordingly, I am striking all extra-record submissions.

**B.    Consideration of No-Action Alternative**

Plaintiffs contend the Forest Service was predisposed to approve the expansion project, in some form, hence the 2004 FEIS did not seriously consider the no-action alternative as a viable option.  The 2004 FEIS states unequivocally that the decision to expand the ski area was made in 1991 and will not be revisited now.  See FEIS I-2 ("This Final EIS will not re-open the decision approving expansion based on the 1991 Master Plan that has already been made"); FEIS I-15 ("The Final EIS will not be used to revisit previous approvals and decisions made under NEPA").

The purpose of the 2004 EIS was to evaluate proposals for implementing the expansion authorized in 1991.  The no-action alternative could not achieve that result, so it was utilized primarily as a baseline for measuring the environmental effects of different action proposals.  Of course, if the 2004 EIS had disclosed a risk of serious environmental harm not contemplated

11 - OPINION AND ORDER

by the 1991 EIS --either because of new information or changed conditions-- the Forest Service would have been obligated to revisit its earlier decision approving the expansion.  However, with a few exceptions,[5] the environmental impact described in the 2004 EIS appears to be within the range contemplated in 1991.  In fact, the expansion project approved by the Forest Service in 2004 is smaller than the one approved conceptually in 1991.  See ROD-44 (1991 EIS contemplated parking for 1,900 vehicles; current proposal is for around 800 vehicles) and 1991 FEIS-1 (plan approved in 1991 would also develop lands around geographic feature known as the Knoll).  The 1991 ROD does state that:

> Each project included within the scope of the Master Plan will require an additional level of environmental analysis before construction is approved.  A "No Action" alternative will be analyzed for each component project submitted."

AR 4411.  This was done.  Both the 2004 EIS and ROD separately evaluated the various project components.  Some components were approved, while others were rejected or revised.

/ / / /

/ / / /

---

[5]  The 1991 EIS said the SUP area did not contain suitable habitat for the Pacific fisher.  However, the fisher's presence on the site proposed for the expansion is now documented.  A second change, post-dating the 1991 Master Plan, is establishment of the McDonald Peak Inventoried Roadless Area ("IRA").  Within the boundaries of the SUP area are 578 acres of roadless forest, including 298 acres formally designated part of the McDonald Peak IRA.  The expanded ski area will encroach upon at least 231 acres of the McDonald Peak IRA.  A third change is the 1994 Northwest Forest Plan, and its plans to protect the northern spotted owl and forest ecosystems.  All of the foregoing information is discussed in the 2004 FEIS, but the Forest Service did not consider the new information significant enough to require revisiting the 1991 expansion decision.

### C.   Predisposition to Favor Ski Area Operator's Proposal

Plaintiff Navickas contends the Forest Service was predisposed to favor the alternative submitted by MAA, which operates the ski area, in preference to the other alternatives evaluated.  Unless there is a large disparity in the environmental impact of the different proposals, it is not irrational for the agency to favor an alternative acceptable to the project applicant over an alternative opposed by the project applicant.  See Citizens Committee to Save Our Canyons, 297 F.3d at 1030 ("Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor").

Plaintiff Navickas also complains that the Forest Service did not select the alternative he and some other persons supported, or the alternative endorsed by the EPA.  The ROD and 2004 FEIS explain why the agency felt those alternatives do not adequately address the project purpose.  Moreover, each action alternative evaluated in the EIS had adverse environmental impacts.  The adverse impacts were just different for each alternative.  The Forest Service balanced the benefits, costs, and environmental impact of each alternative and made a reasoned determination.

Finally, Plaintiff complains that the agency rejected certain proposed alternatives at the outset and did not give in-depth consideration to those alternatives in the FEIS.  An EIS need not consider an infinite range of alternatives.  Westlands Water District v. United States Dep't of the Interior, 376 F.3d

853, 868 (9th Cir. 2004).  "The touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." Calif. v. Block, 690 F.2d 753, 767 (9th Cir.1982).

NEPA does not require agencies to analyze the environmental consequences of alternatives that the agency, acting in good faith, has rejected as impractical or ineffective, or that fail to advance the purpose of the project.  Laguna Greenbelt, Inc. v. United States Dep't of Transport., 42 F.3d 517, 524-25 (9th Cir. 1994) (as amended); City of Aurora v. Hunt, 749 F.2d 1457, 1467 (10th Cir. 1984).  Nor must the agency analyze proposed alternatives that are so similar to the alternatives already being considered that their inclusion would not expand the range of meaningful choices but simply the size of the EIS.  Westlands Water Dist., 376 F.3d at 868.

Appendix D to the 2004 FEIS lists various proposed alternatives the Forest Service weeded out during the environmental review process.  The agency gave a concise but reasoned explanation of why each rejected proposal was unworthy of further consideration.  That is sufficient.  Laguna Greenbelt, 42 F.3d at 524.  The 2004 FEIS included an adequate range of alternatives, especially when the most important policy choices had already been made in 1991.

###    D.    **Whether Project Will Accomplish Stated Purpose and Need**

The ONRC Plaintiffs contend the EIS does not sufficiently demonstrate that the expansion will be a financial success and accomplish the stated purpose of the project.

Whether the expansion project is necessary, and whether it will benefit the ski area financially or instead become its downfall, have been debated for years.  <u>Cf.</u> AR 207-08, 226-36 (discussing issue in context of the 1972 expansion proposal). This court is not the proper forum for resolving those questions.

Operating a ski area is not without financial risk.  The Forest Service and City of Ashland may consider that risk in deciding whether to proceed with this project, and may require a rigorous evaluation of the project's financial viability. However, these economic questions do not weigh heavily in this court's assessment of the <u>environmental</u> impact of the proposed project.[6]

### E.    Challenges to Mitigation Plan

The ONRC Plaintiffs cite ACS Standard and Guideline WR-3, part of the Northwest Forest Plan, for the proposition that "[m]itigation and restoration must not be used to compensate 'for management actions that degrade existing habitat, as a substitute for habitat protection, or to justify risky land management activities and practices.  Priority must be given to protecting existing high quality habitat.'"

I fail to see how that principle applies to the facts of the present case.  The quoted language seeks to prevent actions such as destroying an existing functional wetland on the premise that the environmental impact will be redressed by constructing an

/ / / /

---

[6]    If a project under evaluation has serious environmental consequences, the need for the project (or lack thereof) assumes greater importance.  This is not such a case.

artificial replacement wetland.  Results of such mitigation
projects often prove disappointing.

By contrast, the majority of the mitigation measures
proposed here are not aimed at replacing damaged or destroyed
habitat.  Rather, those measures strive to avoid environmental
harm by utilizing proper construction methods and design,
restricting the times of year when certain work will be
performed, and similar techniques.  That is not "mitigation" in
the sense of replacing lost habitat, but simply doing the job
right in the first place.[7]

Some new potential sources of sediment will inevitably flow
from the expansion project, but procedures intended to minimize
erosion will be utilized.  In addition, the Forest Service will
endeavor to offset any new erosion by repairing some existing
sources of sediment, with the object of minimizing the total
sediment load flowing into the streams and reservoir.  I see
nothing wrong with that.

Nor is there any merit to Plaintiffs' argument that the
mitigation plan is defective because it was attached to the ROD
rather than to the FEIS.  A ROD may logically contain a
mitigation plan in response to environmental concerns raised in
the EIS.  A primary purpose of an EIS is to bring environmental
concerns to the attention of the decision maker, so those

---

[7]    The word "mitigation" is broadly defined in the CEQ
Regulations, and includes "avoiding the impact altogether by not
taking a certain action or parts of an action."  40 C.F.R.
§ 1508.20.  However, Plaintiffs' argument, and the passages they
quote, would be nonsensical in that context.

concerns may be addressed in the agency's decision.[8]  Waiting
until the ROD to disseminate a mitigation plan could be troubling
if it prevented the public or other government agencies from
commenting upon a particularly novel or controversial mitigation
plan.  That does not appear to be a serious concern here.  I also
note that aspects of the mitigation plan were discussed in the
EIS.

Plaintiffs argue there is no assurance the proposed
mitigation plan will be successful.  That is true.  Previous
attempts to mitigate environmental damage in the Mt. Ashland ski
area have a checkered history.  AR 335, 712, 1120.  There is no
guarantee the present efforts will be perfect.

Nevertheless, requiring an ironclad guarantee that
mitigation efforts will succeed is "inconsistent with NEPA's
reliance on procedural mechanisms-- as opposed to substantive,
result-based standards . . . ."  Methow Valley, 490 U.S. at 353.
An EIS must discuss mitigation, but it need not contain a fully
developed plan guaranteed to mitigate all environmental harm.
Id.  See also Laguna Greenbelt, 42 F.3d at 528 ("NEPA requires
only that mitigation be discussed in sufficient detail to ensure
that environmental consequences have been fully evaluated").

---

[8]  The ONRC Plaintiffs also complain that, after some errors
in the draft EIS were noticed by EPA, the Forest Service
corrected the errors in the final EIS.  Plaintiffs assert, "[t]he
fact that the analysis has been corrected - after the public has
reviewed and commented on it -- does not bring the document into
compliance with NEPA."  ONRC Reply at 6 (emphasis in original).
That is a puzzling argument.  An important purpose of circulating
a draft EIS for comment is to identify factual or analytical
flaws before the EIS is finalized.  If every change to the draft
EIS, no matter how minor, triggered still another round of public
comment, the environmental review process would never end, and
agencies would be loathe to acknowledge or correct errors.

In estimating the project's impact on erosion, the EIS presumes the proposed mitigation will be one hundred percent successful.  <u>See</u> FEIS Appx. H-5 ("Second and third year scenarios assume that mitigation measures are in place and fully functioning.")  Consequently, Plaintiffs argue, the EIS is deficient for failing to disclose scientific controversy regarding the effectiveness of the proposed mitigation measures.

Disclosing the risk that mitigation will be unsuccessful-- and explaining how this could impact local waterways--is a different issue from guaranteeing the effectiveness of the mitigation measures.  NEPA generally requires full disclosure. Whether that mandate extends to scientific controversy regarding the effectiveness of the proposed mitigation is not entirely clear in this circuit.  <u>Compare</u> <u>Laguna Greenbelt</u>, 42 F.3d at 528, n.11 (scientific uncertainties in mitigation measures need not be discussed) with <u>National Parks and Conservation Ass'n v. Babbitt</u>, 241 F.3d 722, 734 n.13 (9th Cir. 2001) (such uncertainties "must be discussed . . . during the EIS preparation period" but "need not be discussed during the EIS discussion period") with <u>Idaho Sporting Congress v. Thomas</u>, 137 F.3d 1146, 1151 (9th Cir. 1998) ("Without analytical data to support the proposed mitigation measures, we are not persuaded that they amount to anything more than a 'mere listing' of good management practices'").

I need not resolve that question, however, because I conclude that the mitigation plan does attempt to evaluate the reliability of the proposed mitigation measures.  2004 ROD, Attachment B.  With a few exceptions, each proposed measure was assigned a rating of either:

**E1** -- Unknown or experimental; little or no experience in applying this measure.  May not substantially reduce effect; or

**E2** -- Usually reduces significant effects; often done in this situation; or

**E3** -- Almost always reduces effects substantially; almost always done in this situation.

Plaintiffs may dispute the accuracy of the agency's assessment, but it is there.

**F.    Monitoring of Ashland Creek for Petrochemical Pollution**

The ONRC Plaintiffs complain that the 2004 ROD does not require monitoring of Ashland Creek for petrochemical pollution. Consequently, it is argued, "the public will be uninformed as to whether diesel fuel or other toxics have polluted the municipal watershed as a result of the Mount Ashland Project."  The Forest Service explained why it feels monitoring is neither necessary nor cost-effective.  That determination was not arbitrary and capricious.

**G.    Compliance with Laws Governing Wetlands**

The ONRC Plaintiffs contend the 2004 FEIS fails to disclose whether the expansion project will comply with all applicable laws governing wetlands.  The general assumption is that administrative agencies "will act properly and according to law," unless it is shown otherwise.  Federal Communications Commission v. Schreiber, 381 U.S. 279, 296 (1965); In re Hergenroeder, 555 F.2d 686 (9th Cir. 1977) (per curiam) ("presumption that the

government obeys the law").[9]  If Plaintiffs have proof that the
expansion project violates specific laws governing wetlands, they
can take legally appropriate action, if any.  I won't worry about
that now.  Plaintiffs' claims here are for violation of NEPA and
NFMA, not the Clean Water Act.

### H.  **Concerns with the Sewage Treatment Facility**

Plaintiff Navickas complains that a sewage treatment
facility was constructed on Mt. Ashland to treat waste generated
by the ski resort, and there were instances when nitrogen levels
exceeded the appropriate level.  Plaintiff would be even more
upset, and the nitrogen levels far higher, if MAA was not
treating that effluent.  Attendance at the ski area exceeds
150,000 during a typical season.  FEIS III-169.  The waste that
is generated must go somewhere.  There is a time and place to
address any concerns regarding operation of the sewage treatment
facility.  This is not it.

### I.  **Increased Surface Water Flow**

Ashland has experienced severe flooding from rain-on-snow
events, including major floods in 1964, 1974, and 1997.  The
expansion project will increase the unforested acreage and,
consequently, the total snowpack.  Plaintiffs argue that this
heightens the risk of flooding.  The models relied on by the
Forest Service apparently "do not include any estimate of the

---

[9]    The Mitigation section of the ROD includes the
following proposed action:  "(SOP-5) Comply with all requirements
and standards of the Clean Water Act."  That statement does not,
in itself, establish that the project actually complies with the
Act.  Still, the agency has expressly acknowledged its obligation
to do so.  The 1991 Master Plan, which the present project is
tiered to, also states that "compliance with Federal and State
water quality standards" is required.  AR 4415.

contribution of snow melt to flood flows, nor do they account for
the effect of snow on infiltration or runoff." AR 27046.
Nevertheless, the Forest Service theorizes that runoff from rain-
on-snow events mostly originates at lower elevations, not in the
ski area. Consequently, the FEIS reasons, the proposed project
will not cause a major increase in surface water flow. That
doesn't mean Ashland won't experience severe flooding in the
future--it may--but the Forest Service insists the proposed
expansion will not markedly exacerbate the existing risk of
flooding. This forecast may prove correct, or it may be
incorrect. However, it is not arbitrary and capricious.

J. **Construction in Hazard Zones**

1. **Whether LHZ 2 lands are within the Riparian
   Reserve**

The Northwest Forest Plan assigns the "Riparian Reserve"
designation to streams, ponds, lakes, and wetlands, including a
buffer around these waterways. Northwest Forest Plan Record of
Decision, Attachment A (1994) ("Northwest Forest Plan
Standards"), A-4 to A-5, B-12 to B-17, C-30 to C-31. Also
assigned to the Riparian Reserve are "unstable and potentially
unstable" lands. Id. The rationale for inclusion of these
unstable areas appears to be twofold. First, to prevent erosion
that harms waterways. Second, to ensure that when slides do
occur in headwater riparian areas, "they contain coarse woody
debris and boulders necessary for creating habitat farther
downstream." Id. at B-9, B-19. The Northwest Forest Plan
envisions that "Riparian Reserves also will serve as connectivity
corridors among the Late-Successional Reserves," id. at B-13,

thus promoting dispersal of wildlife.  The Riparian Reserve is an overlay zone that applies even to lands within another designation, such as "Administratively Withdrawn."  Id. at A-4 to A-6, B-12 to B-13, C-1, C-29.

In 1988-89, the Forest Service prepared a detailed "Hazard Zonation Map" for the Mt. Ashland ski area.  AR 1868-71.  Lands considered at risk for landslides were assigned a "Hazard Level" ranging from "1 - Unstable Terrain" up to "4 - Relatively Stable Terrain."  The map, and an explanation of the ratings, were included in the 1991 FEIS.  1991 FEIS at IV-4 to IV-8, Appx. E.

The Forest Service acknowledges that lands classified as Landslide Hazard Zone 1 ("LHZ 1") are part of the Riparian Reserve.  The parties differ on whether lands designated LHZ 2 are part of the Riparian Reserve.

The 1991 FEIS explains that lands designated LHZ 1 were estimated to have a "90% Risk of Landslide under Developed Conditions" in a ten year period.  1991 FEIS IV-5.  Landslides from the portions of the planning area designated LHZ 1 could total 40,000 cubic yards.  Id.  The "delivery potential" --i.e., the likelihood that sediment would reach waterways-- was rated "high."  Id.  LHZ 1 lands are described as "unstable terrain" on the Hazard Zonation Map.  1991 FEIS, Appx. E.

Lands designated LHZ 2 were estimated to have a "70% Risk of Landslide under Developed Conditions" in a ten year period.  Id. The 1991 EIS predicted that landslides from those portions of the planning area designated LHZ 2 could total 28,000 cubic yards. The "delivery potential" was rated "high."  Id.  LHZ 2 lands were described as "low stability terrain" on the Hazard Zonation Map.

22 - OPINION AND ORDER

1991 FEIS, Appx. E.

Lands designated LHZ 3 were estimated to have a 40% risk of landslide under developed conditions in a ten year period, with a "moderate" delivery potential.  LHZ 3 lands were described as "moderately stable terrain" on the Hazard Zonation Map.  Lands designated LHZ 4 were estimated to have a 20% risk of landslide under developed conditions over a ten year period, with a "low" delivery potential.  LHZ 4 lands were described as "relatively stable terrain" on the Hazard Zonation Map.

The 1991 FEIS notes that the existing ski area improvements are all situated on lands "classified as lower risk terrain (hazard zones 3 and 4)."  1991 FEIS, IV-7.  It cautioned that "[d]evelopment[] in high hazard levels 1 and 2 . . . has the POTENTIAL of producing large volumes of sediment" and that "development in zones 1 and 2 has the POTENTIAL of producing up to 68,000 cubic yards of sediment from landsliding."  1991 FEIS, IV-6 (emphasis in original).

The Landslide Zonation and Risk Evaluation system ("LAZARE") utilized by the Rogue River National Forest is further explained in two papers presented at the annual meeting of the Association of Engineering Geologists in October 1997.  B. G. Hicks & Dan R. Sitton, *Landslide Mapping on the Rogue River National Forest: The Application of Zonation Methods for Risk Evaluation*, and Dan Sitton, *Case History: Application of LAZARE to Mt. Ashland Ski Development Area, Jackson County*, compiled in Scott Burns, ENVIRONMENTAL, GROUNDWATER AND ENGINEERING GEOLOGY: APPLICATIONS FROM OREGON (1998), AR 8776-89.  See also 2004 FEIS III-13 (citing to those papers for a description of the technique).

23 - OPINION AND ORDER

These papers explain that the area mapped by LAZARE "represents some of the most unstable terrain on the [Rogue River National Forest]." AR 8778. LHZ 1 is characterized as "highest risk" and LHZ 2 is characterized as "low-stability" "high risk" terrain. AR 8779, 8789. LHZ 1 includes "currently active or active" landslides, while LHZ 2 includes "temporarily dormant" landslides and also "dormant" landslides with "[n]o clear indications of recent movement." AR 8782, 8785, 8789. "The hazard zoning and risk evaluation technique presented here is based on detailed mapping of active and formerly active landslides and potentially unstable terrain." AR 8789.

The 2004 FEIS states that LHZ 2 "is the second highest risk terrain." FEIS III-13. Typically, the slopes are between 50 to 69%, and the land is often upslope from lands designated LHZ 1. Id. The "Site Scale Analysis Area" for the 2004 FEIS includes 213.4 acres of land designated LHZ 2. FEIS III-15. The 2004 FEIS states that the risk of landslides was somewhat overstated in the 1991 FEIS. 2004 FEIS III-14. Nevertheless, the 2004 FEIS concludes that the risk of landslides in LHZ 2 under "natural" conditions, *i.e.,* before any disturbance, is "moderate to high" and the "sediment delivery potential" is "high." FEIS III-15. During the 1997 flood, most new landslides occurred in LHZ 1, but some slides occurred on lands designated LHZ 2. Id. By contrast, LHZ 3 and 4 "has much lower risk of landslide activation than Zones 1 and 2." Id.

Given the foregoing, I conclude that lands designated LHZ 2 are at least "potentially unstable" and thus fall within the criteria for "Riparian Reserve" under the Northwest Forest Plan.

24 - OPINION AND ORDER

The parties' briefs do not adequately discuss the ramifications once it is determined that lands designated LHZ 2 are within the Riparian Reserve.  The conclusion that lands designated LHZ 2 are "potentially unstable" does not mean all areas designated LHZ 2 are inherently unsuitable for any use. The 1991 FEIS states that "Zone 2 is generally suitable for ski runs and lift towers with some mitigation.  It is not suitable for lift terminals, parking areas or buildings.  Ski runs and lifts would require more intensive geotechnical investigations than zone 3.  Such investigations would include downslope areas in hazard zone 1."  1991 FEIS, Appx. E.  Presumably the Forest Service undertook those investigations as part of the 2004 FEIS before approving the expansion project.

      The Northwest Forest Plan Standards generally govern unless the underlying Forest Plan or Resource Management Plan is more restrictive or provides greater benefits to late-successional forest related species.  Northwest Forest Plan Standards, C-2. Northwest Forest Plan Standard RM-1 states that:

> New recreational facilities within Riparian Reserves . .. should be designed to not prevent meeting Aquatic Conservation Strategy objectives.  Construction of these facilities should not prevent future attainment of these objectives.  For existing recreational facilities within Riparian Reserves, evaluate and mitigate impact to ensure that these do not prevent, and to the extent practicable contribute to, attainment of Aquatic Conservation Strategy objectives.

Northwest Forest Plan Standards, C-34.

      The "acreage affected" of LHZ 2 lands is between 13.5 and 16 acres.  FEIS IV-18.  Some or all of those acres will be logged or graded, or both.  If this were an ordinary timber sale, it would

be a simple matter to exclude the affected acreage and comply
with any buffer zone requirement.  A ski run is another matter.
A ski run must be contiguous, and it has many other constraints.
Traversing a small amount of LHZ 2 terrain may be unavoidable if
the expansion project is to be constructed on this site.  One
cannot make an omelet without breaking a few eggs.  The other
action alternatives evaluated in the 2004 FEIS would impact fewer
acres of land classified LHZ 1 or LHZ 2.  FEIS IV-18.  However,
the Forest Service decided that the preferred alternative will
better meet the purpose and need of the expansion project.

### 2.    1999 Alterations to Hazard Zone Map

At a public meeting conducted by the Forest Service on
March 9, 1999, Plaintiff Navickas pointed out that the proposed
expansion project would cut through areas designated LHZ 1.
Several weeks later, the Forest Service issued revised maps on
which all areas in question were re-designated LHZ 2.  The Forest
Service says that after Navickas called attention to this issue,
the agency re-evaluated the hazard zone maps and decided the land
was not so hazardous after all.

Navickas questions this explanation, but the point is moot.
Since I have concluded that both LHZ 1 and LHZ 2 are part of the
Riparian Reserve, any alleged error in reclassifying land to
LHZ 2 is harmless.

### K.    Compliance with MS-22 and MS-26

The ONRC Plaintiffs contend the expansion project violates
Management Strategy 22 ("MS-22") and Management Strategy 26
("MS-26") of the Rogue River National Forest Land Resource
Management Plan ("Rogue River LRMP").  In response, the

26 - OPINION AND ORDER

government cites page I-17 of the 2004 FEIS for the proposition
that "the entirety of the area is designated as 'Developed
Recreation" ('MS-4') [under the Rogue River LRMP] or
Administratively Withdrawn [under the Northwest Forest Plan]."
However, an EIS does not alter land classifications; it merely
compiles information for use by a decisionmaker.  The government
must point to a document that actually effected such a change.

Further undermining the government's argument, the Northwest
Forest Plan contains a clause that preserves the requirements of
an underlying individual Forest Plan when such requirements are
more restrictive or provide greater benefits to late-successional
forest related species . . . ."  Northwest Forest Plan Standards,
C-1.  Thus, even assuming portions of the special use permit area
are now classified as "Administratively Withdrawn" under the
Northwest Forest Plan, the requirements of the Rogue River LRMP
continue to apply to the extent they are more restrictive.

After reviewing the Rogue River LRMP and other documents in
the record,[10] the court concludes that part of the special use
permit area is in the area designated MS-4 (developed
recreation), and part is in the area designated MS-22
(watershed).  AR 3408, 13182.  The Rogue River LRMP specifically
mentions the ski area:

/ / / /

/ / / /

_____

[10]  The government belatedly offered a declaration from a
Forest Service employee, who sought to tell the court what the
agency intended when it enacted the Rogue River LRMP and other
documents.  Decl. of Kenneth Grigsby.  That is not permissible.
Forest Plans and similar documents must speak for themself.

> Most of the Ashland Creek Watershed is managed as
> Management Area 22 -- Restricted Watershed because of
> the sensitivity of the area. . . . A small portion of
> the watershed containing the Mt. Ashland Ski Area is
> Allocated to Management Area 4 - Developed Recreation.
> The possibility of expansion of the ski area is
> recognized.

AR 3435.

The Rogue River LRMP was enacted a year before the ski area boundaries were expanded from 290 to 960 acres. Consequently, the present ski area boundary includes some acreage designated MS-22 on the 1990 LRMP map. AR 3408, 13182. The 1991 ROD expanded the permit boundary, AR 4411, but did not expressly alter the management designation.

The 1990 LRMP contemplated that multiple management strategies might be applicable to a single parcel, and that it would be possible to meet the requirements of each strategy. AR 3469 (Rogue River LRMP 4-31); AR 3496. The designation MS-4 (developed recreation) was intended to be a _more_ protective classification than MS-22 or MS-26. _See_ AR 3434-35 (when portions of watershed are assigned to Developed Recreation, "the requirements of managing a municipal supply watershed will be met"); AR 3469 (priority rankings and discussion of "masking"); AR 3496.

MS-22 is designed to protect watersheds supplying water to municipalities. AR 3703. The ski area is in the Ashland watershed, which supplies drinking water for the City of Ashland. MS-22 provides that "[w]hen conflicts exist between watershed management and other resources, the conflict will be resolved in favor of the watershed resource, subject to rights under law and

28 - OPINION AND ORDER

regulation." Id. "New developed recreation sites will not be constructed. Expansion of existing recreation sites will be analyzed in project environmental analysis." Id. That was done here, both in the 1991 FEIS and 2004 FEIS.

MS-22 includes various provisions aimed at protecting the watershed, such as a prohibition on most off-road vehicle use and a ban on overnight camping and on campfires outside of developed campgrounds. Id. The proposed expansion complies with those requirements. MS-22 requires the agency to evaluate the impact of any proposed project on various species of plants and wildlife, AR 3704, and upon stream courses. AR 3707. This was done in the EIS. MS-22 prescribes management practices for certain species. AR 3705-07. Plaintiffs have not shown a violation of those practices. MS-22 requires a landslide hazard evaluation for all proposed projects. AR 3710. That was done. MS-22 severely restricts timber harvest, AR 3707, but no commercial logging is proposed here. The only trees to be removed are those in the path of ski runs, chairlifts, and other facilities. MS-22 directs the Forest Service to "[r]evise all special use permits to be consistent with the direction in this management strategy when renewed." AR 3709. The permit is not up for renewal at this time.

MS-26 applies to lakes, wetlands, streams, associated riparian habitat, and an adjacent buffer zone. AR 3736. See also AR 3496 ("all streams classed as I, II, and III are allocated to Strategy 26"). The government argues that MS-26 does not apply to the streams within the ski area permit boundary because those streams lack fish. I find it unnecessary to

29 - OPINION AND ORDER

resolve that question, because the provisions of MS-26 are fairly similar to MS-22.  In fact, the Rogue River LRMP anticipated that the MS-22 designation would be more protective of resources than the MS-26 designation.  AR 3469.

The proposed ski area expansion satisfies the principal requirements of MS-22 and MS-26.  To the extent any conflict exists, the Forest Service necessarily intended such a departure when it conceptually approved the expansion in 1991,[11] and approved the site-specific proposal in 2004.

### L.  **Erosion and Sedimentation**

The Mt. Ashland watershed drains into Reeder Reservoir, which provides drinking water for the City of Ashland.  Erosion within that watershed affects the City's water supply and downstream ecosystems.  AR 477, 607-10, 610-12, 619.  The watershed is highly susceptible to erosion.  Oregon Department of Environmental Quality, *An Evaluation of the Ashland Creek Drainage Basin Relative to the City of Ashland's Municipal Water Supply* (1973) (the "1973 DEQ Report"), AR 328, 332.

### 1.  **Erosion from the Existing Ski Area**

Plaintiffs contend the FEIS fails to disclose or discuss credible evidence of longstanding erosion problems at Mt. Ashland and criticism of a study the Forest Service relied on in concluding that there is no erosion problem.

---

[11]  The Forest Service had stated that the 1991 ROD did not amend the 1990 Rogue River LRMP, hence a "Forest Plan Amendment will be needed. . . ."  AR 55229.  See also 68 Fed. Reg. 2873, 2874 (Jan. 19, 1999).  The Forest Service subsequently declared that it would be treated as a "non-significant amendment," AR 12594, and then later decided the agency need not go through the amendment process at all.  2004 FEIS I-1.

The ski area was constructed in 1963 to 1964.  Several
studies during the 1970s reported a dramatic increase in
sedimentation in the Ashland Creek watershed.  See 1973 DEQ
Report, AR 328-41; James M. Montgomery, Consulting Engineers,
Inc., *Water Resources Management Plan and Facility Study* (1977)
("Montgomery Report"), AR 588, 607-10, 618-19, 677-83.[12]  The
Montgomery Report states that prior to 1955, less than 4,000
cubic yards of sediment entered Reeder Reservoir annually.  It
further reports that in 1964, at least 60,000 cubic yards entered
the reservoir and, from 1968 to 1972, the rate was estimated at
20,000-30,000 cubic yards a year while between 1973 and 1976,
approximately 262,000 cubic yards of sediment were taken from the
reservoir.  AR 607, 609-10.  See also AR 330 (similar estimate);
AR 417, 451 (report by Sandra Wilson, U.S. Forest Service).

Much of the increased sediment was blamed on logging in the
watershed and associated road construction, AR 333, 618, 677-701,
708, but the ski area was also listed as a major contributor.
AR 335.  See also AR 692 (estimating ski area generated 38,300
cubic yards of sediment in 13 year period); AR 698-99 (estimating
ski area responsible for eight percent of all sediment reaching
Reeder Reservoir during 22-year period); AR 701, 712.  A 1972
FEIS warned of serious erosion problems that would require
decades to repair.  AR 191.  The DEQ Report and Montgomery Report
both expressed grave doubts about expanding the ski area.
AR 335-40, 712.

---

[12]  The copy of the Montgomery Report in the administrative
record is marked "draft."  No party has identified any important
changes in the final version.

The Forest Service established an erosion control plan, AR 1065-78, but problems persisted.  A 1979 letter from District Ranger Glendon Jeffries recounted "huge volumes of soil being transported directly into the East Fork of Ashland Creek . . . . I am now convinced and will testify that the Mt. Ashland Ski Area is a major source of pollution for the Ashland Creek Watershed."  AR 1120 (emphasis in original).  See also AR 1118-19 (1979 letter from Margaret Holman, USFS).

In 1978, the Forest Service constructed a small sediment dam on the East Fork of Ashland Creek to trap and measure sediment leaving the ski area.  A second sediment dam was added in 1980. The two dams were monitored for several years.  "Interpretation of the results [was] difficult due to a series of problems with the dams."  AR 1716.  They overflowed, or sprang leaks, or water and sediment "piped" under the dams.  AR 1192-93, 1197, 1716. One dam trapped no sediment during the years it operated.  AR 1715-16.  Still, "we have learned enough to claim success even though we weren't as successful as we had hoped to be."  AR 1716.

The study concluded that, "on the average, less than 10 cubic yards of sediment left the ski area" each year.  Brazier, Origins and Characteristics of Sedimentation in Reeder Reservoir (1987), AR 1614, 1637.  "This is considerably less material than had previously been assumed and the area certainly does not appear to be a major source of sediment input into Reeder Reservoir."  Id.

There are tensions between Brazier's study and some earlier documents.  When experts express conflicting views, an agency may "rely on the reasonable opinions of its own qualified experts

32 - OPINION AND ORDER

even if, as an original matter, a court might find contrary views more persuasive." Marsh, 490 U.S. at 378.

### 2.    Forecast for Erosion from Expanded Ski Area

In forecasting erosion from the ski area expansion, the 2004 FEIS relies on the Brazier study along with simulations using the Water Erosion Prediction Project ("WEPP") computer model.  The FEIS characterizes WEPP as "the best model currently available to describe conditions found in mountainous terrain." See, e.g., FEIS IV-21.  The agency states that erosion from the expansion project will not exceed "approximately 10.1 cubic yards in the first two years after disturbance, before returning to near background levels by year three." FEIS S-9.  This image of accuracy is enhanced by tables showing erosion forecasts for each stream stated to the one one-hundredth of a cubic yard per year. FEIS IV-25.

While the WEPP model may have a substantial margin of error, that is not necessarily fatal.  In many cases, it will suffice to supply a range of possible outcomes and an estimate of the probability, *e.g.,* a 95% probability that erosion will not exceed a certain amount.  Also essential to an informed decision is a discussion of the implications of different quantities of sediment.  Whether the expansion project will generate 7 cubic yards of sediment a year, or 77 cubic yards, is of little consequence if even 700 cubic yards of sediment a year would not cause serious environmental harm, or if any resulting harm is manageable and more than offset by the benefits to be derived from the project.

In such an analysis, the law does not require perfection.

33 - OPINION AND ORDER

Given the complexity of an EIS, there always will be something the agency might have done differently.

The FEIS includes an extensive discussion of erosion. Plaintiffs knew of the earlier studies.  So did the City of Ashland and the Forest Service.

The record contains no affirmative evidence of a severe sedimentation problem in the Ashland watershed after 1979.  Even during the most severe periods of erosion, the ski area was thought to be responsible for no more than eight percent of the sediment entering the reservoir.  Better management practices and mitigation measures have reduced the volume considerably.  The road and parking lot, potentially major sources of sediment, were paved about 1988.  FEIS III-28-29.  Other large sources of sediment, such as road construction and commercial logging, are now severely restricted within the Ashland watershed.  In short, the watershed is much healthier now than when the DEQ and Montgomery Reports were written.

If Reeder Reservoir were still choked with sediment, surely the City of Ashland would have mentioned this in response to the draft EIS, and the record would be replete with complaints from the City or its attorneys.  The City's silence is a strong indication that the sediment problem that plagued Reeder Reservoir in the 1960s and 1970s has been resolved.  To be sure, care must be taken in managing the watershed, lest the erosion problem return.  In designing and constructing the present project, MAA and the Forest Service have been forewarned. Preventing erosion will be an important consideration from the outset.

The varying levels of sedimentation are fully disclosed in the records. The levels discussed in the Montgomery and 1973 DEQ reports far exceed even the most pessimistic projections by Plaintiffs of sedimentation resulting from the proposed ski area expansion. Even if the 2004 FEIS understates by a factor of ten the erosion that may result from the proposed ski area expansion, that would mean just two hundred cubic yards of additional sediment entering Ashland Creek during the first year --assuming an average year-- or a few thousand cubic yards of additional sediment in an unusually wet year. That is well below the tens of thousands of cubic yards per year mentioned in the DEQ and Montgomery reports. A reasonable supposition is that the environmental impact from a few hundred cubic yards of sediment a year reaching Ashland Creek would be far less significant than what occurred during the 1970s.

The City of Ashland plays a unique role as holder of the special use permit. Regardless of whether the City has a legal right to veto the proposed expansion --a question I do not decide-- as a practical matter it is unlikely MAA would proceed with the expansion project if the City strenuously objected. In taking a position on the expansion project, the City will have the benefit of all information.

### M. __Other Issues__

Plaintiffs' contentions regarding the pacific fisher mostly rely on extra-record materials that I have stricken, and events that post-date final approval of the ROD. The only matter before me is the agency's decision in 2004. I have reviewed Plaintiffs' other arguments and find them unpersuasive.

35 - OPINION AND ORDER

## Conclusion

The Declarations of George Badura (docket # 46), Ken Crocker (# 47, # 99), William Elliot (# 86, # 125), Richard Brazier (# 98), Jeffrey Heglie (# 55), Eugene Wier (# 97), Eric Navickas (# 56, # 106), David Steinfield (# 87), Gordon Grant (# 126), Kenneth Grigsby (# 127), Peter Jones (# 128), Lee Webb (# 129), and the Second Declaration of Jeffrey Hanson (# 79), are stricken.  The motions to strike (# 83, # 101) are moot.

Plaintiffs' motions for "summary judgment" (# 44, # 52) are denied.  The motions for "summary judgment" by the federal defendants (# 82) and by Defendant-Intervenor Mt. Ashland Association (# 74) are granted.

The ONRC Plaintiffs' motion (# 149) for preliminary injunction is moot.  Plaintiffs' motion (# 152) for injunction pending appeal is denied.  However, I temporarily enjoin MAA from proceeding with construction until March 12, 2007, so the Ninth Circuit has an opportunity to rule on any motion for a stay.[13] This injunction automatically dissolves at 5:00 p.m. (PDT) on March 12, 2007, unless extended by the Ninth Circuit. Plaintiff's motion (# 153) for bond waiver is denied as moot.

IT IS SO ORDERED.

DATED this 9th day of February, 2007.

/s/ Owen M. Panner
_____
Owen M. Panner
United States District Judge

---

[13]  The parties shall make a good faith effort to agree on any aspects of the project that may go forward in the interim. Those steps, if agreed to by all parties in writing, are exempt from the temporary injunction.